**PARIS & G. N. R. CO. et al. v. STAFFORD.**

**No. 3938.**

Court of Civil Appeals of Texas. Texarkana.
Feb. 6, 1931.

Rehearing Denied Feb. 19, 1931.

Goree, Odell & Allen, of Fort Worth, and Edgar Wright, of Paris, for appellants.

Sturgeon, Birmingham . & Sturgeon, of Paris, and Sizer & Gardner, of Monett, Mo., for appellee.

SELLERS, J.

This suit was filed ·by Pearl Stafford, administratrix of the estate of Cecil Stafford, deceased, against the Paris & Great Northern Railroad Company and the St. Louis-San Francisco Railway Company, to recover damages · for herself and minor children for the killing of her husband, an employee of the defendants in an accident near Paris, Tex., September 9, 1927. The deceased, Cecil Stafford, on that date was employed as locomotive fireman on a passenger train from Paris to Ft. Smith, Ark., and was killed in an accident and derailment which occurred at Trout ·Spur, in Texas, and just north of Paris and on defendants' line of road. The pleadings of plaintiff which raise the issues to be decided by this court are as follows:

"Plaintiff states that on the afternoon of said date, and a short time prior to the timé her said husband was injured, three colored boys while operating a Ford car on said highway and while making the turn or curve to cross over said railroad track near said switch stand, ran into and struck said switch stand with said Ford car, and by reason of the old, rotten, deteriorated and decayed condition of said cross tie to which said switch stand was spiked and by reason of the defective condition of said switch and switch stand, the attachments and fastenings thereof, and by reason of being set upon one tie instead of two, the said switch stand was moved and the top part thereof was slightly leaned or shoved over, and its fastenings and attachments loosened; all of which facts were known to the defendants, its agents, and employees, or by the exercise of proper care and diligence could have been known and ascertained by them in time to have avoided the injury and death of plaintiff's said husband.

"That they were further negligent in that they failed to exercise ordinary care to maintain said switch, switch stand, and connections, and the ties under said main line track, in a reasonably safe condition, in that the tie upon and to which said switch stand was spiked was old, rotten, deteriorated and decayed, and said switch, switch stand and its connections were loose, insecure, unsafe and inoperative, and of insufficient strength to support and safely carry the weight of a large locomotive engine and train being operated over said main line track."

The pleadings of the defendants involving the same issues are as follows: "That if the death of the said plaintiff's decedent was not caused by an unavoidable accident, then that the death of the said plaintiff's decedent was caused solely by the intervention and independent acts of third parties, over whom these defendants had no control, in tampering with, knocking down, displacing and attempting to replace a switch stand located on defendants' property, doing so in such manner that the switch points were not placed against the rails, causing the derailment of defendants' train, on a spur track located on defendants' property, and the accident resulting in said plaintiff's decedent's death; that the aforesaid acts of these third parties were unknown to defendants or their employees, and that same occurred within such a short time prior to injury of the said plaintiff's decedent by the derailment of defendants' train; that these defendants did not know of same and could not, by the exercise of ordinary care, have learned of same in time to have prevented the injury and death of the plaintiff's decedent and defendants are not liable therefor."

The court submitted the case to the jury upon special issues which are as follows:

"This case will be submitted to you for a special verdict; certain issues of fact will be submitted for your findings in the form of

the questions hereinafter propounded to you, which you will answer from the evidence in the case, writing your answer to each question in the space left following the question. Your answers, when made, will constitute your verdict in this case.

"Before propounding the questions referred to above I give you the following definitions or instructions:

"1. Ordinary care, as used in this charge, means that degree of care that an ordinarily prudent person would use under the same or similar circumstances. A failure to use ordinary care is negligence, as that term is hereinafter used in this charge.

"2. The proximate cause of injury, as the term proximate cause is used in this charge, is meant some negligent act or omission which without the aid or intervention of any new or intervening cause naturally caused the injury complained of and without which the injury would not have occurred and to be proximate cause the act or omission complained of must have been such that a person of ordinary prudence and foresight should reasonably have anticipated that the injury complained of, or some similar injury might result therefrom.

"(By new or intervening cause, referred to in the definition of proximate cause in paragraph 2 is meant some independent act or omission reasonably sufficient of itself to have caused the injury complained of.)

"3. The tie referred to in the evidence in this case upon which the switch stand mentioned in the evidence was attached will be referred to hereinafter in this charge as the switch tie.

"Question No. 1: Do you find from a preponderance of the evidence in this case that on September 9, 1927, prior to the derailment of the train in question, that the switch tie in defendants' track at Trout Spur was in a decayed, rotten or deteriorated condition? Answer: 'Yes.'

"Question No. 2: If you have answered 'yes' to Question No. 1 above then do you find from a preponderance of the evidence in this case that the condition of the switch tie caused the track at said place to be not in a reasonably safe condition for the employees of the defendants to operate its trains over at said place? Answer: 'Yes.'

"Question No. 3: If you have answered 'Yes' to Questions Nos. 1 and 2 above, then do you find from a preponderance of the evidence in this case that the agents and servants of the defendants were guilty of negligence, as that term is defined in paragraph 1 of this charge, in permitting the switch tie to be in the track at said time and place; that is, do you find from a preponderance of the evidence that the agents and servants of the defendants had not used ordinary care to keep said track at said place in a reasonably safe condition for the employees to operate trains thereon? Answer: 'Yes.'

"Question No. 4: If you have answered 'Yes' to Question No. 3 above, then do you find from a preponderance of the evidence in this case that such negligence was the proximate cause of the derailment of the train and the death of Cecil Stafford? Answer: 'Yes.'

"In arriving at your answer to Question No. 4 above, you are instructed that if you have found in answer to Question No. 3 that the defendants' servants and agents were guilty of negligence in permitting the tie to be under the track at said time and place, and if you further believe from the evidence that just prior to the derailment of the train certain negroes negligently ran an automobile against the switch stand and by reason of the rotten, decayed or deteriorated condition of the switch tie moved the same, and thereby, or in trying to replace the stand the switch points were caused to be opened, and if you further believe that the negligence of the defendant in permitting the switch tie to be under the track at the place contributing or concurring with the negligence of the boys in running against the switch stand was the efficient cause of the opening of the switch points and the derailment of the train, you will answer 'Yes' to Question No. 4 above.

"If, on the other hand, you believe that the running of the automobile by the negro boys against the switch stand was the sole cause of the derailment, then you will answer 'No' to Question No. 4 above.

"Question No. 5: If you have answered 'Yes' to Question No. 4, then answer this question, What amount do you find would reasonably and fairly compensate the plaintiff, Pearl Stafford for the damages sustained by her by reason of the death of her husband, C. E. Stafford? Answer: '$10,000.00.'

"5—A: What amount do you find would reasonably and fairly compensate the child Loraine Stafford for the damages sustained by her by reason of the death of her father, C. E. Stafford? Answer: '$5,000.00.'

"5—B: What amount do you find would reasonably and fairly compensate the child, Harold Eugene Stafford for the damages sustained by him by reason of the death of his father, C. E. Stafford? Answer: '$5,000.00.'

"In arriving at your answers to the questions last above, you may take into consideration the loss of such money as you believe C. E. Stafford would probably have contributed to the support and maintenance of his wife, Pearl Stafford, during his life and as to his children, such money as you believe he probably would have contributed to their support and maintenance during their minority, as well as the value of such admonition, education and training as said two children probably would have received from him during

their minority had the said C. E. Stafford not been killed. But in no event can you take into consideration or allow compensation for the loss of his affection or companionship or the grief and sorrow occasioned the wife and children or either by reason of his death.

"You are the sole judges of the facts proven, the credibility of the witnesses and the weight to be given their evidence."

The court entered judgment in favor of the appellee against the appellants for the sum of $20,000 upon the answers to the issues submitted to the jury.

The first and second propositions of appellants complain of the court's failure to instruct the jury to return a verdict in their favor. While the propositions are rather lengthy, in their final analysis they present this question, that the acts of the negroes in striking the switch stand was the sole cause of the derailment and injury complained of.

■ It will be remembered that this suit is brought and prosecuted under the Federal Employers' Liability Act (45 USCA §§ 51–59), and to establish liability of defendants it was necessary, not only to prove negligence of defendants, but that such negligence was the sole or contributing (approximate) cause of the derailment of the train and the injury occasioned thereby.

The first three issues submitted to the jury are warranted by the evidence and unquestionably established negligence on the part of defendants, and there has been no serious contention here that the evidence did not justify such findings by the jury.

■ In passing upon the issue of proximate cause we find the rule stated in the case of Milwaukee & St. Paul Railway v. Kellogg, 94 U. S. 469, 474, 24 L. Ed. 256, to be: "The true rule is, that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending." The same rule applies in determining the proximate cause as in determining negligence, and in the case of Richmond & Danville Railway v. Powers, 149 U. S. 45, 13 S. Ct. 748, 749, 37 L. Ed. 642, it is stated: "Where there is uncertainty as to the existence of either negligence or contributory negligence, the question is not one of law, but of fact, and to be settled by a jury; and this whether the uncertainty arises from a conflict in the testimony, or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them."

We will not undertake to set out all the evidence in this case bearing on this question, but the following quotations are deemed sufficient:

"We met a truck on the highway right there. I don't remember whether it was a Ford truck or a Chevrolet truck, but I am sure it was a truck. We met it right there at the spur, where the highway crosses the railroad. I aimed to make the turn and cross the railroad, the truck was coming from the west and I was headed west, that caused him to take the inside track and me to take the outside track and in making the turn I ran off the highway and off the bluff and up against the switch stand. The highway there at Trout Spur is graveled. I was not driving very fast as I got to that corner and started to make the turn. I don't know exactly how fast I was driving, between fifteen and twenty miles. There was nothing between the road and the switch stand I hit, no posts or anything of the kind. There were only two of us in the car when it left the highway and I was one of them, just as the car left the highway and started down the bluff my brother jumped out, he was sitting in the back end of the car. There were two of us in the Ford when I ran it up against the switch stand. * * * When the car hit the switch stand it knocked the stand about half way over. Then we got out of the car and pushed it back, straightened it back and got a hammer from an old man living over there and nailed it down. All we had to nail it back down with was the hammer. We used the same spikes that were in it. The switch stand was not knocked off the switch tie. The first thing we did after we ran against the switch stand was to get out and push it back from against the stand, push the car back, then we straightened the stand back up, it was knocked a little better than half way down. On the south side the spikes were practically pulled out and on the north side they were not, and we pushed it back up and nailed it down where it was. After we got the switch stand fixed we cranked the car up and backed it out on the highway. One of the tires had a hole in it and we took it off and patched it and pumped it up and then went on to where we had started, the three of us. We went on to Bokchito after that in the car. The car was not broken in any way by reason of running against the switch stand, I drove it on to Bokchito, all the rest of the way."

" * * * The switch stand was setting on one tie. The switch tie or head block was a pole tie, I mean that just one tie was made out of the tree, the sap part of it had rotted off and it was cracked open in several places, there was one large crack I could run my hand in and it appeared to be in an unsound condition. By in 'an unsound condition' I mean it was rotten."

"I saw the switch stand, the switch tie and the switch when I was there on Monday and I examined the switch tie, it was still in the track when we were there. The switch tie was very rotten, doty, decayed, I saw some

holes in it, but I do not remember how many. From the examination I made of it you could not tell one hole from another, they all looked alike, the tie was so soft and in such a rotten condition that there was no difference in the holes that I could see."

"* * * The pieces of wood I have here came off this side of the tie, where it was badly decayed. Both ends of the tie was rotten, I do not know which end of the tie the stand was on, but both ends were rotten, in fact, the whole tie was rotten."

"I looked at the switch tie it had been on, and I looked at it the second time I was there, after the wreck, along there where the switch stand was. The tie I saw I consider it was a rotten tie, the boys took the hammer in one hand and drove it down there and you could not drive a spike in a sound piece of wood—when it is plumb sound you could not take a two or three-pound hammer and drive it as easy as if I had been driving a nail."

"I lived in Columbus, Georgia, before I came to Paris and was employed as a locomotive engineer. I have had twelve years experience in operating an engine, four years as fireman and eight as engineer. I worked for the Central Railroad Company of Georgia. As such engineer I had experience in the operation of both passenger and freight trains. * * * The operation of trains, heavy locomotives and passenger trains has a tendency to loosen the spikes that fasten the rails to the ties. * * * The effect of a locomotive weighing seventy or eighty tons, pulling a steel train would have upon the rail and upon the spikes that held it to the tie, if the tie was in a decayed and rotten condition, would be that the vibration of the cars on a decayed tie would loosen the spikes. I said that the vibration of an engine would loosen the spikes. A locomotive engine, pulling the kind of train you have named, vibrates laterally, backwards and forwards, as well as up and down on the rails it runs on. * * * There are several things that would cause a switch to cock open, loose spikes holding the switch stand to the switch rail—to the switch tie, or loose spikes in the switch tie of the main rail, loose parts of the switch stand."

"I said I saw some spike holes in the tie, the holes were about the size of the spikes, but it looked like they were large enough the spikes would not hold, not tight enough. I saw that there was just a little rusty scale on the spikes."

No witness undertook to say with what force the Ford car struck the switch stand and from this record the fact is undisputed that the car was not injured in the collision. Neither does any witness testify as to the position of the switch points until after the train was wrecked.

We are of the opinion, from the evidence above quoted, that the court was clearly authorized in submitting the case to the jury.

There can be no escape from the fact that there existed the possibility of danger by reason of the decayed and rotten condition of the switch tie, the dislodgment of the switch stand so defectively maintained might have been occasioned by a number of causes, such as cattle on the range rubbing against it; the surge and swaying movements of heavy trains; or the idle hand of a passerby.

Under the authority of Washington & Georgetown Railway v. Hickey, 166 U. S. 523, 17 S. Ct. 661, 41 L. Ed. 1101, it was not necessary that appellant should foresee the very thing that did dislodge it, that is, the collision with an automobile; the material thing for appellants to foresee was that by reason of the defective switch tie the switch points might be moved, for any cause, a sufficient distance to cause a split switch.

It is true that this case presents an unusual occurrence, but that fact will not excuse the liability of appellants. They should have anticipated those things which might happen even if such occurrences would be unusual. San Antonio & Aransas Pass Railway v. Behne et al. (Tex. Civ. App.) 198 S. W. 680, and cases therein cited.

Complaint is made by various assignments and propositions thereunder of the court's charge. We have carefully considered all of them and are unable to agree with appellants that any of them present error. Article 2190, R. C. S. 1925, authorized the court where a case is submitted on special issues to submit such explanations and definitions of legal terms as shall be necessary to enable the jury to properly pass upon and render a verdict upon the issues submitted. It is our opinion that the paragraph following special issue No. 4 of the court's charge was a proper explanation in this case, and without it the jury could not have intelligently answered special issue No. 4. Davis, Agent, v. Pettitt, (Tex. Com. App.) 258 S. W. 1046.

There was no error by the court in admitting over defendants' objection Plaintiff's Exhibits A and B, said exhibits having been sufficiently identified by the witness Arthur.

The argument of plaintiff's counsel could not be considered an error such as would warrant a reversal of this case unless it should appear that the damages assessed were excessive. The damages in this case are not excessive, and we have been unable to find any cases that hold to the contrary.

There are a number of assignments in the record which have not been discussed in the opinion, but all have been considered and those not mentioned are deemed without merit and are overruled.

Finding no errors in the record, we are of the opinion that the judgment of the trial court should be affirmed, and it is so ordered.

### On Motion for Rehearing.

■ Appellant insists in its motion for a rehearing that the portion of the court's charge following special issue No. 4 is a general charge and not authorized where a case is submitted on special issues and cites in support of its position the case of the St. Louis Southwestern Railway of Texas v. Hudson (Tex. Com. App.) 17 S.W.(2d) 793, in which the Supreme Court held certain portions of the court's charge were general charges and not authorized since the case was submitted on special issues. This court agreed with the Supreme Court in that particular case that the charges constituted general charges on questions of fact which the jury were called upon to answer, but for other reasons held that the appellant in that case was estopped to complain on appeal of the error committed by the trial court.

We think the question here is entirely different from that presented in the Hudson Case. In the case at hand the court submitted in the first two issues questions of fact and gave no general charge whatever in connection with them. The third and fourth issues were questions of law for the jury to determine from the facts under appropriate instructions by the court. Special issue No. 3 in this case required no explanation by the court except a definition of negligence which was given, and it was in connection with the fourth issue that the court gave an additional explanation to the jury of approximate cause that the appellant here insists was error.

As stated in our original opinion, this case was an unusual occurrence, and the case is equally as unusual in that both parties should plead and prove the acts of the same third parties; appellant contending that the act of the negroes was the sole cause of the derailment and injuries complained of, while appellee insists, equally as vigorous, that said acts of the negroes contributed with the negligence of appellant to cause the derailment and injuries. Under this condition of the facts, it was certainly proper for the court to advise the jury what group of facts, if believed by the jury, would constitute proximate cause, and which would not, and we cannot understand how appellant could be injured by the instructions given.

■ If the instructions had not been given and the jury had answered "No" to said special issue, it would seem to us that plaintiff would have had just cause to complain for the very reason that they were not bound by the negligence of the defendant alone, as constituting proximate cause, as the question as submitted might have led the jury to believe, but were entitled to recovery if any negligence of defendant coupled with the acts of the negroes constituted proximate cause.

■ Appellant again insists that the instructions given by the court to the jury upon the issue of damages was incorrect, and cites a federal case, Gulf, C. & S. F. Ry. Co. v. Mosler, 275 U. S. 133, 48 S. Ct. 49, 72 L. Ed. 200, in support of its position. We think the rule with respect to the assessment of damages in Texas was complied with by the instructions given by the court, and, if the appellant desired the court to follow the rule announced in the Mosler Case, it should have requested a correct charge embodying that rule. Western & A. R. R. Co. v. Hughes, 278 U. S. 496, 49 S. Ct. 231, 73 L. Ed. 473. This appellant did not do, and therefore cannot be heard to complain.

We have carefully considered appellant's motion for a rehearing, and we are unable to agree with appellant that we were in error in our original opinion. Therefore, appellant's motion for a rehearing is overruled.